# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | John A. Nordberg | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 93 C 3438 | **DATE** | 5/27/2004 |
| **CASE TITLE** | Anglin vs. Sears, et al | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]   Enter memorandum opinion and order. For the reasons stated in this Court's Memorandum Opinion and Order, the Court enters judgment for the defendants, Sears, Roebuck and Co., and Margaret Edidin and against the plaintiff, Steven K. Anglin.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | Document Number |
|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | | |
| | No notices required. | | number of notices | | |
| | Notices mailed by judge's staff. | | | | |
| | Notified counsel by telephone. | | MAY 28 2004 date docketed | | 181 |
| ✓ | Docketing to mail notices. | | | | |
| ✓ | Mail AO 450 form. | | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | | | |
| | TP | courtroom deputy's initials | | date mailed notice | |
| | | | Date/time received in central Clerk's Office | mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

STEVEN K. ANGLIN,                    )
                                     )
            Plaintiff,               )
                                     )
                                     )     No. 93 C 3438
      v.                             )
                                     )
SEARS, ROEBUCK AND CO. and           )     Judge John A. Nordberg
MARGARET EDIDIN,                     )
                                     )
            Defendants.              )

**DOCKETED**

MAY 2 8 2004

## MEMORANDUM OPINION AND ORDER

Plaintiff Steven K. Anglin alleges that defendant Sears, Roebuck and Co. fired him

ostensibly for willful misconduct when the real reason was to avoid paying him severance

benefits. His sole remaining claim is one under § 510 of ERISA, 29 U.S.C. § 1140, which

prohibits interference with an employee's rights under a benefits plan. This decision sets forth

the Court's findings of fact and conclusions of law after a three-day bench trial.

## OVERVIEW OF ARGUMENTS

Steve Anglin was fired for willful misconduct in a meeting with his department

supervisor on March 20, 1992. He was surprised and angered by the decision. Although he

admits that he had areas that needed improvement, he was not aware of anything that would

justify being fired, especially for willful misconduct. In this meeting, he was told that he had a

belligerent attitude and that he had been involved in several incidents with co-workers. He

asserts that these incidents never happened in the way alleged and that they were not serious in

any event. He also alleges that the decisionmakers made no serious attempt to investigate or substantiate the allegations and never tried to get his side of the story. Therefore, he believes that the company's stated reasons for firing him are pretextual and that the real reason he was fired is that the company wanted to prevent him from receiving severance benefits as part of a reduction-in-force ("RIF") then being implemented. He claims that, if he had not been fired on March 20th, he would have been selected in April as one of the participants in the RIF and would have been let go and paid severance benefits.

Sears, not surprisingly, tells a different story. It claims that the firing was justified in every way. According to Sears, over the months leading up to the termination, plaintiff had shown an increasingly belligerent attitude toward management and the new computer system that was being rolled out. In addition, he had been involved in several serious incidents with co-workers, which were investigated and substantiated. In short, Sears argues that its decisionmakers were honestly concerned about the increasing number of reports about plaintiff's abusive and bizarre behavior.

## SUMMARY OF BENCH TRIAL PROCEDURE

The bench trial took place on October 15, 16, and 17, 2002. Both parties were well represented by counsel at trial. At trial, the court heard testimony from Steven Anglin, Audrey Walker, Gus Doukas, Margaret Edidin, Robert Ferkenhoff, Marianne Dutkiewicz, and Patricia Mongello. In addition, the parties submitted part or all of the deposition testimony of Kristin Pieranunzi Mologousis, Leslie Shaffer, Robert Gelwicks, John Kevin Walsh, and Tom Wilczak.

The Court has reviewed the memoranda and arguments of counsel, the testimony of the witnesses, the depositions of absent witnesses, the exhibits received into evidence, the trial

-2-

transcript, and detailed notes taken by the Court at trial. The Court has taken care to appraise each witness's credibility and to determine the weight to be accorded his or her testimony. In so doing, the Court considered the witnesses' intelligence, ability, and opportunity to observe; their age, memory, and manner while testifying; any interest, bias, or prejudice they may have had; and the reasonableness of their testimony in light of all the evidence presented in the case. The Court recorded its impressions of the witnesses in its notes.

In reaching its conclusion in this case, the Court has sought to draw reasonable inferences from the evidence, and has considered the parties' legal arguments. In the opinion of the Court, the evidence at trial requires judgment for defendants. The Court now makes its finding of fact and conclusions of law pursuant to Fed. R. Civ. P. 52(a).

## FINDINGS OF FACT

Plaintiff Steve Anglin graduated from high school in 1977 and immediately started working for Sears in a minimum-wage position making $3.40 an hour and eventually worked his way up to a checklist associate, which is a salaried employee. (Tr. 25-26, 32.) At the time he was fired, he had worked for the company for 15 years and was making approximately $52,000 a year. (Tr. 30, 34.)

Plaintiff eventually became a technical consultant in 704 DS, which is a department in the information systems division of Sears. (Tr. 27.) He specialized in advanced function printing, which involves printing documents such as credit statements. (Tr. 28.) His direct supervisor was Gus Doukas who in turn reported to Margaret Edidin, the department manager, who ultimately reported to Bob Ferkenhoff, the vice-president of information systems. (Tr. 30.)

-3-

During his career at Sears, plaintiff had received many positive performance reviews and had been praised by his supervisors on occasion. For example, Doukas, who worked closely with plaintiff, testified that he was "very conscientious" and "committed" and that he would work long hours including weekends. (Tr. 263.) At the same time, he had occasionally been criticized about his work, particularly his ability to get along with co-workers. (Tr. 91.) In his January 1991 performance review, given to him approximately a year before he was fired, plaintiff received an overall performance grade of "above expectations." (Tr. 35; PX 1.)[1]

The events that led to his firing took place in the time period from approximately November 1991 until March 1992. Around this same time period, two other significant events were taking place within the company. First, Sears was preparing to move its corporate headquarters from the Sears Tower in downtown Chicago to the suburban Hoffman Estates location. In preparation for this move, the company was testing and implementing a new computer system using personal computers rather than mainframe dedicated terminals. This implementation was known as the "Hoffman Estates rollout," and plaintiff and others in his department were selected as "beta users" to test the new equipment. (Tr. 39-40.) These changes made it a stressful time in the company. (Tr. 164.)

Second, during this same time period, the company was implementing a RIF. In January 1992, plaintiff and other employees attended a videotape presentation explaining the upcoming RIF. In the videotape, the chairman of Sears described the RIF and indicated that employees let go would receive certain severance benefits. He also said that "head counts" of exactly who would be let go would be announced in April 1992. (Tr. 38.) Plaintiff considered the statements

---

[1]DX and PX will refer, respectively, to defendants' and plaintiff's trial exhibits.

made in the videotape a "promise" and relied on them to continue working for the company. (Cmplt. ¶ 5-6.) The severance benefits that were promised consisted of two weeks pay for each year of service, continuation of paid medical insurance coverage, and other unspecified benefits. (Id.)[2]

Given that this case is ostensibly about interference with ERISA benefits, there is surprisingly little specific evidence as to how the RIF would be implemented. Each department manager had authority to recommend who would be a participant from his or her department. (Tr. 221.) It is unclear whether there were any targets or quotas. One witness (Doukas) recollected that there needed to be a 5% reduction overall but that there was no requirement that each department had to meet this specific percentage. (Tr. 256-57.) In plaintiff's department, which generally consisted of high-performing employees, it was anticipated that fewer would be chosen to participate than in other departments. (Tr. 220.) Unfortunately, no records exist as to which employees or how many were actually chosen in April 1992. Doukas, the only witness to offer any testimony on this point, could only recall one person from his department "being RIF'd." (Tr. 285.) It is undisputed, however, that there was no budgetary restriction on the amount of severance benefits that could be paid and that the money was paid out of Sears's general corporate funds. (Tr. 222-23; see also Tr. 229: "nobody was really concerned about where the money was coming from").

There were two selection criteria used to determine who would be a participant in the RIF: (i) the elimination of a person's job functions and (ii) low performance relative to other

---

[2] The benefits were pursuant to the 1992 Closed/Unit Reorganization Package, which the parties agree constitutes an "employee welfare benefit plan" for purposes of ERISA.

members of the group. (Tr. 275.) Although plaintiff argues that he may have been selected under either ground, the Court concludes that he would not have been selected under either one. It is true that the company did not formally replace plaintiff's job after he left. However, it is undisputed that the company continued to need the job functions (advanced function printing) and had to pay more money to a speciality contractor to have the functions performed. (Tr. 264.) As Doukas testified, the company paid "a pretty penny" to this contractor. (*Id.*) When asked whether plaintiff might have been selected for position elimination, Walker testified "absolutely not." (Tr. 221.) As for job performance, all witnesses agreed that plaintiff was technically proficient in his job.[3] Therefore, this Court finds that plaintiff would not have been eligible based on either of the stated criteria.

There is no evidence that plaintiff was ever selected to be a part of the RIF. Two witnesses testified on this issue, and both doubted that plaintiff would have been chosen. Doukas said that the only time he ever heard of plaintiff's name as a possible candidate was in a meeting in January or February of 1992 when Edidin asked: "how about Steve Anglin, would he be a candidate?" (Tr. 257.) Doukas then said: "no, absolutely not." (*Id.*) After this meeting Doukas never saw or heard anything suggesting plaintiff was slated to be a participant. (Tr. 278-79.) Audrey Walker testified that she never saw plaintiff's name on any termination list. (Tr. 233.)

Plaintiff's theory of the case – also analyzed in Section III - is that Edidin was initially trying to "position him" as a possible RIF candidate in the months leading up to the announcement of the April head counts. This claim is based on two facts. First, as set forth above, Edidin asked Doukas in the January meeting if plaintiff would be a candidate. Second,

---

[3]This issue is addressed in more detail in Section III.

sometime in late January, Edidin asked Doukas to lower one component of plaintiff's grade, which was entitled "work relations: interpersonal skill," to a rating of "below expectations." (Tr. 250-52; PX 2.) Plaintiff's overall grade in this January 1992 performance review was "meets expectations," which was one-step lower than the "above expectations" grade in his January 1991 review. (PX 1.)

In March 1992, Margaret Edidin met with Bob Ferkenhoff and Audrey Walker, who was the human resources manager for the information systems department, to discuss several incidents involving plaintiff. Walker described the context:

> The situation arose because of an increasing disturbance because of the things that had gone on with Mr. Anglin over the course of several months which made it very difficult.
>
> It was a difficult time for us. We were all preparing for a move to Hoffman Estates, we had a new platform. For most people this is the first time we had computers. It was a very intense time of moving. And the situation became increasingly day by day a little bit more untenable with Mr. Anglin's attitude, and that was the subject of the meetings.

(Tr. 164.)

Walker stated that she did some checking into the allegations against plaintiff and "tried to verify them as best I could with people to whom the incidents had occurred." (Tr. 165-66.) She also spoke to someone in the Sears legal department whose opinion she trusted. (Tr. 208.)

Plaintiff argues that Sears made the decision to fire him in a compressed period of time, taking only two days to meet, investigate, and make the decision. This contention is based on an interrogatory answer in which Sears stated that the firing meetings took place on March 19th and 20th. However, at trial, Walker doubted whether all the activity could have taken place in two days. (Tr. 206; 215: "I cannot conceive that we met two days and decided to terminate

someone.") Based on this testimony and other evidence,[4] the Court concludes that the entire decisionmaking process took more than two days.

Although Walker participated significantly in the process, she only did so in an "advisory capacity" because the decision was made for all practical purposes by Edidin. (Tr. 155.) Ferkenhoff was Edidin's supervisor and nominally listed as the ultimate decisionmaker, but it is clear that he deferred to Edidin and let her make the decision.

On March 20, 1992, Edidin called plaintiff to her office and told him that he was being fired. In addition, the company prepared two termination memos that describe the reasons for the firing. These sources, taken together, provide a consistent picture of the company's reasons for the firing.

Plaintiff testified that Edidin told him in the March 20th meeting that he was being fired because he had "a belligerent attitude" that had been "getting worse lately" and because of four specific events: (1) he was seen in the women's bathroom on a weekend day; (2) he had nude pictures on his computer; (3) he yelled at Gus Doukas in the project management class; and (4) he told a co-worker to "get the fuck out of his office." (Tr. 46-47.)

Plaintiff seemed to know what Edidin was referring to (*see* DX 1) and tried to explain his behavior. For example, he said that he had used the women's bathroom the past Saturday (March 14th) but did so only because he was sick and did not have time to walk to the men's bathroom, which was further down the hall. As for the nude picture, he said: "Well, Margaret, I

---

[4]For one thing, Doukas testified that Edidin informed him that plaintiff would be fired "two or three days" before he was actually fired. (Tr. 254.) Therefore, this conversation would have taken place before the 19th. Moreover, in this conversation, Edidin described the same four incidents that she later described to plaintiff in the termination meeting. (Tr. 259.)

didn't realize [the picture] was a problem. If it was, why didn't you ask me to remove it? I would have taken it off." (Tr. 48.) As for the charge that he swore at a co-worker, plaintiff said: "Margaret, we already talked about that a while ago and that never happened." (Tr. 49.)

The meeting ended with the following exchange (again, as recounted by plaintiff):

Well, I kind of told her, Margaret, I was really surprised about this. I thought things had been actually getting better lately. The project management class was very good. I had been going to counseling for a while, anyway, for other reasons and I've been working through things there to just become a more effective person, and so on. I thought things were getting much better.

And then she said, "Well, Steve, perhaps this is a good time for you to start anew." And I just – I couldn't say much more. I was kind of shocked. She then said we have to go to Audrey Walker's office for your exit interview.

(Tr. 49.)

At the exit interview, plaintiff asked Walker for an explanation. She said she would discuss the matter with Edidin and "get you something." (Tr. 51.) Walker also asked plaintiff to sign a form in which he admitted to willful misconduct, but he refused to do so. (*Id.*) Several days after the firing, Doukas stormed into Walker's office and asked for the documentation for the firing and she didn't have any. (Tr. 286.) He got the impression that there wasn't any documentation. (*Id.*)

A couple of weeks later, on April 2nd, Anglin received a one-page memo (PX 5) that described the reasons for firing.[5] (Tr. 52.) The memo, dated March 20th and unsigned, states in full:

Over the last several months there have been several incidents involving Steve Anglin and other associates of a very serious nature. They include abusive

---

[5]The envelope was postmarked on April 1st. (Tr. 52; PX 6.)

behavior, improper use of company property, and inappropriate, unprofessional behavior, rising to the level of willful misconduct.

- The use of inappropriate language on at least two occasions to Sears associates

- Using the Ladies Restroom on a week-end day

- Misuse of company property

(PX 5.) When he received this memo, plaintiff said he understood what the first two bullet points referred to but did not know what the third bullet point referred to. (Tr. 68.)

Sears also prepared a second, more detailed memo, which plaintiff never received at the time and only learned about in discovery. This one-page memo, also dated March 20th and unsigned, states in full:

Over the last several months there have been several incidents involving Steve Anglin and other associates of a very serious nature. They include abusive behavior, improper use of company property, and inappropriate, unprofessional behavior, rising to the level of willful misconduct

- Steve walked into another associates office and began to berate her on the choice of the new office platform telling her that he didn't know how she could possibly have chosen this "shit" and how terrible it is. He also spoke of how terrible the training was, when in fact he had not attended the training.

- When one of the associates whose job it is to install the new equipment entered his office to do so, he told her to "Get the f _ _ out."

- A female employee was assigned to work a weekend day and when she entered the ladies restroom she encountered Steve in there at the sink. He merely walked out past her, without a word of explanation.

- Steve called one of our IBM consultants into his office to show her how he had "customized" his screen. What he had done was replace the standard Hoffman Estates background with black and white caricatures of women in various stages of undress.

- He has demonstrated an increasingly negative attitude towards management during this period of time.

- Return informer terminal.

(PX 18.)

This memo elaborates upon the earlier one, providing more specific detail regarding, for example, the bathroom incident. It also adds a new charge in the first bullet point, which is an incident involving Leslie Shaffer.[6]

Audrey Walker testified unequivocally – and the Court finds her testimony to be believable - that all of the conduct relied upon to terminate plaintiff occurred before he was fired: "I would never have prepared a document documenting what the employee did after the termination." (Tr. 178.)

At trial, Sears also pointed to three other incidents that justified the firing: (i) plaintiff allegedly said, in front of two other co-workers, that Leslie Shaffer was an "airhead"; (ii) plaintiff allegedly called Edidin's secretary, Marianne Dutkeiwicz, stupid and unintelligent; and (iii) plaintiff allegedly was rude to Audrey Walker when she asked him a question about computers. However, because Sears never clearly established that Edidin relied on these reasons at the time of the firing, the Court will not consider them as part of the company's official explanation for the firing.

As framed by the parties, the central issue in this case is whether plaintiff engaged in the alleged conduct in these five incidents. As discussed below, in order to show that the company's official explanation is pretextual, plaintiff must do more than simply show that the company

---

[6]The sixth bullet point is also new, but is not an issue here because Sears subsequently concluded that it was not correct. Plaintiff did not make any argument based on this bullet point.

made an error in judgment. Instead, he must prove that the official explanation is a lie or has *no* basis in fact and that plaintiff's employment was terminated to deprive him of his RIF rights. With this standard in mind, the Court will now examine each of the five incidents in detail.

### 1. Telling a co-worker to "get the fuck out of my office"

This incident is the first one chronologically. It is described in the second bullet point of the second termination memo as follows: "When one of the associates whose job it is to install the new equipment entered his office to do so, he told her to 'Get the f _ _ _ out.'." (PX 18.)

Plaintiff denies ever making this specific comment but does remember an incident involving the installation of new computer equipment. According to plaintiff, this incident occurred sometime in "late November, early December" of 1991 when he received his new computer equipment. (Tr. 40.) An IBM representative, Kristin Pieranunzi, came by to deliver a new computer terminal.[7]

According to plaintiff, when he saw Pieranunzi in the hallway as she was coming to his office to deliver his new computer equipment, she said: "Steve, they're going to deliver the Hoffman PC in your office." (Tr. 133.) He said: "Shit, they can't do that, I'm not ready yet. I haven't been trained." (*Id.*) Plaintiff admits he was upset because he thought it made no sense to deliver his computer before he had even been trained on it. (Tr. 40-41.) However, although he expressed his frustration to Pieranunzi, he claims that he did not blame her for the problems and was only frustrated with management. Plaintiff specifically denies telling her to "get the fuck out of his office" or anything similar and denies raising his voice. Although he admits using the word "shit" in this conversation, he denies that he swore *at* Pieranunzi. He also says that she

---

[7]Pieranunzi later married and is now Kristin Pieranunzi Mologousis.

never indicated that she was offended by his comments. After the discussion, Pieranunzi put the computer in the corner of plaintiff's office, "unhooked up." (Tr. 41.)

To plaintiff, the whole affair was a non-event and he would not even have remembered it except for the fact that later in that same day he received a visit from Edidin, who came to talk to him about what she called his "disturbing" behavior. Plaintiff described this meeting:

> Well, that evening, it was late afternoon or early evening, 5:00 or 6:00 I think, I was working in my office and Margaret Edidin stopped by. And she had said, "Steve, I heard something disturbing today, I heard you told a person to get the F. out of your office." And that was quite a surprise to me and I said that never happened.

> \* \* \*

> [] I just told her [] what [Pieranunzi] was saying that, you know, I'm getting my PC today and I told her I wasn't trained on it yet, you can't install it, I wouldn't know how to use it and I had a number of other projects going on at that time. And just that I asked her to leave it there and she left it there, and so that's all it was about the computer installation.

(Tr. 42 – 43).

Ten minutes later, plaintiff walked down to Edidin's office to discuss this issue. He described this second meeting:

> After [the first meeting], maybe ten minutes later I walked to her office and talked to her about it a little bit more, trying to clarify or ask her from whom she heard this from. I don't remember much of the details of that conversation, but I think things worked better then after that conversation, I got that impression.

(Tr. 43-44.) He believes that he smoothed things over with Edidin in this second meeting and thought the incident was not a big deal because it was never mentioned again until nearly four months later when he was fired. At the same time, he conceded that it seemed like "a pretty serious" matter. (Tr. 89.)

A different version is told by Pieranunzi, who was not called as a witness at trial but who testified in a deposition. She testified that the incident occurred in plaintiff's office (rather than the hallway) and involved work on a computer. Plaintiff said "something" to her. Although she did not remember what he said, because the incident happened "a while ago" before her deposition, she did remember that he said something in an "unprofessional" tone. (Dep. 33, 15: "I didn't appreciate the tone of the unprofessionalism."). She also said that plaintiff was yelling and being loud. (*Id.* 33.) Despite the fact that she did not appreciate plaintiff's behavior, she "wasn't that upset about it." (*Id.* 15.) She had no specific recollection as to whether Anglin said "get the fuck out of my office." Immediately after she left his office, she reported the incident to her supervisor, Rich Tamborski, who reported it to plaintiff's supervisor. (*Id.* 12, 15-16, 20.)

In sum, even though Pieranunzi only had a general recollection of the incident, it is clear that her version contradicts that of plaintiff. She testified that he was unprofessional, loud, and yelling. In contrast, he testified that he did not yell and that he acted appropriately, thus implicitly denying that he had an unprofessional tone. Thus, as with many of these encounters, the Court is faced with competing versions of events.

Plaintiff argues that this incident never happened and was merely a rumor that circulated around the office. However, the reporting of this incident does not fit within the typical profile of an office rumor, which slowly percolates until it eventually reaches management several days or weeks later. Here, it is undisputed that only a few hours elapsed between time of the event and the time that Edidin showed up at plaintiff's door. The speed with which this incident was reported suggests a more intentional effort to bring it to management's attention and seems less like idle chatter. Moreover, the Court finds that Pieranunzi's description is believable based on

-14-

the fact that it is remarkably similar to Leslie Shaffer's description of her encounter (discussed below). Likewise, the claim that plaintiff was yelling and loud is consistent with the allegations in the project management class (also discussed below).

Plaintiff thinks it is significant that Picranunzi said the event "didn't upset her." This is one of his recurrent themes. However, the fact that an employee downplays an event does not mean that she thought it never happened or that she was not offended by it. It simply may mean that she is willing to move on after an isolated encounter. Here, even though Pieranunzi was not overly upset, she nonetheless made the effort to "immediately" report the incident to her supervisor. The fact that she took the time to do so indicates that she believed something improper happened.

Plaintiff suggests that management fabricated this incident because Picranunzi testified that she never talked *directly* to either Leslie Shaffer or Audrey Walker about this incident (Pieranunzi Dep. 11) while both women testified that they thought they did talk to her at some point. This apparent conflict is not significant and is ultimately a red herring. It is undisputed that Pieranunzi reported the incident to Tamborski who then communicated – either directly or indirectly – to Edidin. It is also undisputed that Edidin confronted plaintiff only hours later and specifically accused him of telling Pieranunzi to "get the fuck out of his office." Thus, it is clear that *somebody* told Edidin about it. Plaintiff seems to be suggesting that Walker and Shaffer were intentionally lying when said that they remembered talking to Pieranunzi. This contention is not believable in light of all the evidence.

## 2.    Telling a co-worker that the new computer system was "shit"

The first bullet point of the second termination event describes this incident as follows:

> Steve walked into another associates office and began to berate her on the choice of the new office platform telling her that he didn't know how she could have chosen this "shit" and how terrible it is. He also spoke of how terrible the training was when in fact he had not attended the training.

(Pls. Ex. 18.) The associate involved was Leslie Shaffer. In her deposition, she stated that the description set forth above accurately reflected what happened. (Dep. 37 – "they've got it kind of verbatim down there").

Shaffer elaborated on the incident in her deposition, stating that it was a "one-way conversation" in which plaintiff "just expressed his dislike for what we had done to date about the selection of the hardware, the software, and how we were training people." (Dep. 37, 39.) She further said that he did not give any "concrete or constructive criticisms" and "summed it up by saying [the new computer system] was shitty." (Dep. 39, 42.) Other employees had expressed negative opinions, but plaintiff's criticism was different: "We [] were not accustomed to being sworn at so there was, there was a lot of people who didn't like it, but [] there was no other [] swearing about it directly to us. Now, maybe they sat in their offices and carried on; I don't know." (Dep. 43.)

Shaffer also stated that plaintiff complained about the computer training, which caused her to later check whether he had yet attended the training. When she checked her records, she learned that he in fact had not gone through training yet. After plaintiff expressed his criticisms,

-16-

Shaffer said "I'm sorry you feel that way" and then walked away. (Dep. 40.) Shaffer said that the event upset her "only slightly" and she "didn't lose sleep over it." (Dep. 41.)[8]

At trial, plaintiff could not recall whether or not he said "the computer system was crap" or that it was a "piece of shit" but conceded that it was possible he could have made those comments. (Tr. 102-04.)

### 3. The project management class

The project management class was conducted by an outside instructor named George Pittagorsky. No one could clearly identify the date of the class, although Doukas guessed that it took place sometime in mid-January 1992. (Tr. 268.) Witnesses estimate that somewhere between 20 to 35 people attended with a number of people from 704 DS. Pittagorsky had the participants engage in a simulated survival exercise with participants divided into two groups. At one point, there was a general discussion in which plaintiff made some comments.

Plaintiff argues that his behavior was appropriate for the class. Although he "may have" raised his voice, he said that it was a "high energy class" in which there was a lot of excitement and loud voices. (Tr. 59-60.) Plaintiff could not remember whether he ever made any comments about management, but specifically denied that he was ever yelling. (Tr. 107.)

---

[8]Walker testified that she talked to Shaffer in mid-March and that Shaffer described the incident by saying that plaintiff had been "less than pleasant" and that the "whole effort" of the Hoffman rollout was "was being definitely castigated as being stupid." (Tr. 167-68.) Plaintiff relies heavily on this "less than pleasant" description and tries to use it to argue that the incident was minor whereas Sears uses the term "hostile." Whatever label is used to describe the encounter is less important than what specifically happened.

Two witnesses contradict plaintiff's versions. First, Doukas, who testified at trial, as follows:

> During the class Steve started giving some of his opinions on management. He went on a little bit too long and I got upset and I told him to stop. He was getting a little obnoxious, you know, just rambling on about it. And we had a little, you know, discussion back and forth and that was it.

(Tr. 259). Although Doukas agreed with plaintiff's claim that the instructor had asked for active participation, Doukas still believed that plaintiff's participation "went a little bit [] too far." (Tr. 282.) It went far enough that Doukas felt he "had" to "say something" in the meeting to plaintiff. (*Id.*) He said that the encounter took place in front of the whole room and someone else in the room could have been disturbed by it. (Tr. 269.) Despite his decision to speak to plaintiff during the meeting, Doukas later "didn't think [the incident] was a big thing." (Tr. 260.)[9]

Second, Wilczak, in deposition testimony, corroborated Doukas's account. Although he could not remember a lot of the details of the event, which took place four and a half years before his deposition, Wilczak testified that plaintiff used profanity "as a general description of Sears management," was "very vocal," and made comments that were "slanted to the negative tone as opposed to constructive." (Dep. 21, 24, 25.) Like Doukas, Wilczak became concerned that plaintiff's comments were not "beneficial for the entire group" and were "possibly steering the course off track." (Dep. 24.) So, at the first break, he asked Pittagorsky if he "would like [Wilczak] to speak to Steve to keep us on track." (Dep. 26.) Pittagorsky responded that he was "an experienced instructor, don't worry about it." (*Id.*) In the end, Wilczak, like Doukas, thought that incident was "not a big event." (Dep. 31.)

---

[9] In his deposition, Doukas stated that plaintiff had been yelling; at trial, he backed away slightly from this description and preferred to say that plaintiff was merely loud. (Tr. 269.)

Neither Wilczak nor Doukas remembered going to management with this issue as neither felt it to be that significant. But it is clear that somebody reported it to management as both men confirm that Edidin raised the issue in a staff meeting. Edidin recounted how the issue came up:

> The subject came up in one of my staff meetings, so I heard it directly from Gus Doukas and another manager who reported directly to me, Tom Wilczak, both of these people had attended the class. And I'm not quite sure how it came up in the meeting. There was some smirking going on and I asked what happened and it was described to me.

(Tr. 299.)

The comments – however characterized – were serious enough to cause Doukas to confront plaintiff directly in the meeting and to cause Wilczak to talk to the instructor during the break. Thus, contrary to plaintiff's claim that he was merely acting in the spirit of the exercise, it is clear that he was doing something more. Wilczak stated that plaintiff used profanity specifically *to describe management* and made negative comments.

### 4. The Nagel Pictures

This incident is described in the fourth bullet point on the second termination memo:

> Steve called one of our IBM consultants into his office to show her how he had "customized" his screen. What he had done was replace the standard Hoffman Estates background with black and white caricatures of women in various stages of undress.

(PX 18.) The person involved in this incident was Maureen Rose – an IBM consultant. Plaintiff remembers a time when Rose came into his office and believes that it is possible (he is not sure) that she saw some of pictures. However, he strongly denies that he called her into his office for the purpose of showing her the pictures and instead says he was merely trying to show her "what

I had set up on the scripting, the icon things." (Tr. 120-21.) He thus seems to allow for the possibility that she inadvertently saw the pictures.

Leslie Shaffer testified that she did talk to Rose directly:

[O]ne of the people working for me – who actually was an IBM consultant [] -- was called in to assist Steve after the terminal went in. And he displayed, he had pornographic material installed on his personal computer and, to my knowledge, didn't need help at all; he only did that [] to show this gal.

(Dep. at 19.) Shaffer reported the incident to Edidin who then walked down to the person's office who had seen the pictures and asked her about it. (Tr. 291.) No one could confidently identify when this incident took place, although Edidin said that it was very close to the time plaintiff was fired. (Tr. 291.)

Plaintiff readily admits that he had partially nude bitmaps on his computer. They were black and white pictures of women in various erotic poses – several of them contained no nudity at all while a few showed an exposed breast. (PX 7-17; Tr. 56-57.) The pictures were by a well-known graphic artist named Patrick Nagel. (Tr. 57.) Plaintiff concedes they could be considered "erotic" and "sexually suggestive" but denies they were pornographic. (Tr. 58, 119.) The pictures would come up when certain computer applications were launched. Plaintiff got the pictures from the company's "M" Drive, which is a common drive accessible to all employees. He testified that no one could see the screen from his doorway and that you would have to walk around his desk. (Tr. 55.)

Plaintiff does not really dispute that the incident was reported to management in the way that was later described in the termination memo. Instead, he blames Sears for not investigating the incident further and for not looking at the pictures to see whether they were truly

-20-

"pornographic." This argument does not change the analysis. First, there is no requirement that the company must have looked at the pictures. Second, the termination memo makes it clear that it was the act of showing the picture to a co-worker (rather than how graphic the picture was) that raised questions about his judgment. Third, after looking at the pictures at trial, the Court finds that the description of them set forth in the termination memo is reasonably accurate.

### 5.      Using the Women's Bathroom

The "bathroom incident" received a lot of attention at trial. It is described in the third bullet point of the second memo as follows: "A female employee was assigned to work a weekend day and when she entered the ladies restroom she encountered Steve in there at the sink. He merely walked out past her, without a word of explanation." (PX 18.)

Patricia Mongello, who was called as a witness at trial by Sears, testified that she walked into the bathroom on a weekend day (the door was not locked) and encountered plaintiff inside washing his hands. He finished up, looked at her, and then just walked out. He was five feet away and never said anything and never offered any explanation for why he was in the bathroom. According to Mongello, plaintiff did not appear sick. (Tr. 375.)

Mongello did not report the incident right away. She did not even know plaintiff's name at the time she saw him in the bathroom. Several months later, she was having a conversation with Tamborski and Denise Molawe when plaintiff's name came up in a negative way. (Tr. 376-377, 383.) It was only at this point that Mongello determined that the man she saw in the bathroom was Steve Anglin. (Tr. 383.) Mongello then told Tamborski and Molawe about seeing plaintiff in the bathroom. Tamborski asked her why she hadn't said anything earlier: "I don't know why I didn't say anything. I just didn't." (Tr. 378.) Tamborski then talked to someone

and came back and asked her to speak with Audrey Walker about the situation. (*Id.*) Mongello then talked to Walker. (Tr. 170, 379).[10]

Plaintiff testified that he was working on the weekend, was sick, and needed to use the bathroom quickly and used the women's bathroom only because it was closer to his office. Moreover, he says that he took steps to avoid an awkward encounter – first calling out to see if anyone was in the bathroom and then locking the door to make sure no one would come in. Because the door was locked, no one came in. Besides, it was a weekend and few people were around. He does not remember seeing anyone around, although he concedes that it is possible someone may have seen him going into or coming out of the bathroom.

The conflicts between the two stories are obvious. Plaintiff says that no one was in the bathroom and that no one could have walked in given that he locked the door. Mongello was confident at trial that she saw him in the bathroom five feet away from her. Her description of his behavior – nonchalantly washing his hands – would also undermine his explanation that he was sick. If he was, then why would he not simply say so when he encountered Mongello in this awkward situation?

Based on the demeanor and testimony of the witnesses at trial, the Court finds Mongello's testimony credible and believes her when she says that she saw plaintiff in the women's washroom. It is true (as plaintiff argues) that Mongello waited several months to report the incident and did not know his name at the time of the incident; however, she expressed no doubt later when she connected up the name with the face. She likewise was not hesitant at trial in

---

[10]Others also heard about the incident, including John Walsh ( Dep. 10-11) and Pieranunzi. (Dep. 34-35.)

asserting that plaintiff was the man she saw. The Court does not find plaintiff's explanation that the men's bathroom was too far away – to be credible given the relatively short distance involved.[11] In sum, the Court finds that Sears had a reasonable basis for believing that plaintiff used the women's bathroom in a way that raised questions about his behavior.

## DISCUSSION

ERISA § 510 states in pertinent part: "It shall be unlawful for any person to discharge . . . a participant . . . for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan . . . ." 29 U.S.C. § 1140. Section 510 was designed "to prevent persons and entities from taking actions which might cut off or interfere with a participant's ability to collect present or future benefits." *Tolle v. Carroll Touch, Inc.*, 977 F.2d 1129, 1134 (7th Cir. 1992); *see Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 143 (1990) ("By its terms § 510 protects plan participants from termination motivated by an employer's desire to prevent a pension from vesting."). In contrast to an action under § 502 (29 U.S.C. § 1132), in which the participant must "first qualify" for the benefits provided in the plan, a party bringing a § 510 action is alleging that the company interfered with his "ability to meet these qualifications in the first instance." *Tolle*, 977 F.2d at 1134.

To prevail under § 510, plaintiff must show that employer had a "specific intent" to interfere with his RIF benefits. *Salus v. GTE Directories Serv. Corp.*, 104 F.3d 131, 135 (7th Cir. 1997). If a plaintiff has no direct evidence of this specific intent, he may rely on the burden-

---

[11] The men's bathroom, although located adjacent to the women's bathroom, can only be accessed by going around several offices and entered from the opposite side. Witnesses estimated that plaintiff would have had to walk another 100 to 150 feet to reach the men's room.

shifting *McDonnell Douglas* framework. *Id.* Plaintiff concedes that he has no direct evidence in this case, and therefore relies on this method. This method is as follows:

> a plaintiff [must] establish a prima facie case of interference by demonstrating that he (1) belongs to the protected class; (2) was qualified for his job position; and (3) was discharged or denied employment under circumstances that provide some basis for believing that the prohibited intent to retaliate was present. Once the plaintiff establishes a prima facie case of interference, the burden shifts to the defendant to offer a legitimate, non-discriminatory reason for the challenged employment action. If the defendant presents a legitimate reason, the burden then shifts back to the plaintiff to demonstrate that the proffered explanation is pretextual and that the "motivating factor behind the termination" was the specific intent to interfere with the plaintiff's ERISA rights.

*Id.* (citations omitted).

Sears argues that plaintiff has not established a prima facie case because he has not shown that he had been (or would have been) selected for the RIF; thus, he is not a member of the protected class. Sears further argues that, even if plaintiff established a prima facie case, he cannot prevail because he has not shown that the reason Sears fired him was a pretext. To show pretext, plaintiff must show that Sears' explanation is either "a lie or completely lacks a factual basis." *Jordan v. Summers*, 205 F.3d 337, 343 (7th Cir. 2000). It does not matter if the reason is "mistaken, ill considered or foolish" as long as it is "honestly believed" by management. *Id.*

## I.    Whether Plaintiff Has Shown That Would Have Been Selected For The RIF?

As noted above, plaintiff must prove that the decisionmakers fired him because they were motivated (at least in part) to interfere with his benefits. *See generally Meredith v. Navistar Int'l Transp. Corp.*, 935 F.2d 124, 127 (7th Cir. 1991) ("no action lies where the alleged loss of rights is a mere consequence, as opposed to a motivating factor behind the termination"). To establish this point, plaintiff must first show that management had either already selected him to be a RIF

participant or that management intended in the future to select him. As discussed below, he has failed to prove this key point.[12]

Plaintiff has offered no credible evidence to suggest that he ever would have been included in the RIF. He never was specifically told that he would be included nor did he ever receive anything in writing that would suggest he was included. In his complaint, he relies solely on the fact that, in January 1992, Sears presented a videotaped presentation to him and other employees in which Sears "promised" benefits to those employees who would be released as part of the RIF. (Am. Cmplt. § 5.) Yet, it is clear that no decision had been made at this point about which particular individuals would be selected. Many people who attended this presentation were ultimately not selected. Only one person from plaintiff's department was discharged. Thus, the mere fact that plaintiff was asked to attend this meeting is not in any way probative that he would have been selected.

Moreover, as set forth in the findings of fact, the Court has found that plaintiff did not meet either of the two criteria for being selected for the RIF. There is no other evidence to

_____

[12]From the beginning of this case, it has always been clear that plaintiff would ultimately have to first prove this key point. *See Anglin v. Sears, Roebuck and Co.*, 1993 WL 437430, *3 (N.D. Ill. Oct. 27, 1993) ("If Defendant did not intend to terminate Plaintiff as part of the [RIF] program, then Plaintiff would not be entitled to the severance benefits package. On the other hand, if Defendant did intend to terminate Plaintiff as part of the [RIF] program, then Plaintiff would be eligible for the severance benefits package, and this Court would have to decide whether Defendant's reason for terminating Plaintiff prior to the initiation of the benefits package was pretextual."); *Anglin v. Sears, Roebuck and Co.*, 179 F.Supp.2d 836, 839 (N.D. Ill. 2001) ("a fundamental premise of [plaintiff's] claim is that, when the managers at Sears fired him, they believed that he would be a participant in the RIF plan. Without this premise, plaintiff's § 510 claim falls apart."). Contrary to plaintiff's suggestion, this key issue has never been decided in any previous ruling and thus the law of the case doctrine has no applicability. This issue is similar to, but analytically distinct from, the issue whether (for jurisdictional purposes on removal) plaintiff met the definition of "participant" in 29 U.S.C. § 1132. *See Anglin*, 1993 WL 437430 at *4-5.

suggest that the company *ever* decided (or even seriously considered) that plaintiff would be a participant in the RIF. Two of plaintiff's own witnesses – Doukas and Walker – said that they saw various candidate lists and that plaintiff's name was never on them. Walker testified that "the decisions had already or were certainly in the process of being made and Mr. Anglin was not on th[e] list." (Tr. 233.) Doukas testified that he never believed that plaintiff would have qualified under either criteria for being selected – either position elimination or low performance. The only mention of plaintiff's name came in one meeting when Edidin mentioned whether Anglin was a possible candidate. However, Doukas immediately shot down this idea.

In the end, plaintiff relies merely on the unproven and self-serving speculation that, despite the fact that there is no evidence that he had been slated to be a part of the RIF, that the company *conceivably could have changed its mind* later after he was fired. But there is no evidence to support this theory either. Plaintiff cannot meet his burden of proof by relying solely on bare speculation that he could have been selected for the RIF later.

## II.   Was The Firing Pretextual?

Plaintiff's main argument is that he was performing well and that the company fired him out of the blue to deprive him of RIF rights. Plaintiff spent most of his time at trial trying to show that he did not do the things described in the termination memos. Therefore, the central issue in this case is the following. Did plaintiff engage in – or did the company at least have a *reasonable basis for believing* that he engaged in – the alleged conduct?

As set forth in the findings of fact, the Court has found that each of the defendants' witnesses testified truthfully and that plaintiff did not. Therefore, the company clearly had credible grounds for believing a different and more troubling version of events than the version

given by plaintiff. It was not firing him simply because he used the women's bathroom in an emergency or because he had erotic pictures on his computer. Instead, as set forth in the termination memos, the company believed that plaintiff had used the women's bathroom without any justification or else he would have offered an explanation when confronted by Mongello. It believed not merely that he had erotic pictures on his computer, but that he had invited an IBM representative into his office for the explicit purpose of showing her those pictures. It believed that he did more than use a loud voice in the project management class; he made negative comments about management in a way that disrupted the class.

For each incident, the company received a credible and believable eyewitness report from one or more co-workers that plaintiff had engaged in the conduct attributed to him in each of the five incidents. Specifically, Picranunzi confirmed the substance of the first encounter; Shaffer the second; Doukas and Wilczak the third; Rose the fourth; and Mongello the fifth. In addition, Audrey Walker investigated most of these claims providing an additional layer of corroboration.[13]

No evidence was introduced that any of these witnesses had a vendetta against plaintiff or were intentionally trying to set him up to be fired. Almost all of them were neutral witnesses who had no obvious axe to grind and who were no longer working for the company when they testified.[14] *See generally Williams v. Washington*, 59 F.3d 673, 682 (7th Cir. 1995) ("In a

---

[13]Other individuals were tangentially involved as well. For example, Walker consulted an in-house attorney for advice.

[14]The only possible exception is Shaffer. Plaintiff has tried to suggest that she was biased due to the fact that her husband is a high-level executive with the Canadian division of Sears. Although it is possible that she was sympathetic to Sears's position, just as Doukas was sympathetic to plaintiff's, there is no evidence that she was intentionally trying to get him fired

-27-

credibility contest, the testimony of neutral, disinterested witnesses is exceedingly important."). Pieranunzi, for example, had been working for another company for four years at the time of her deposition. (Dep. 6.) At the time of trial, Walker was working for the College of Dupage (Tr. 152), and Mongello was working for AT&T (Tr. 370). Rose apparently had moved out of state and was no longer working for Sears. Moreover, these witnesses generally testified that plaintiff's behavior did not greatly upset them, thus showing that they were not trying to exaggerate the incident in an effort to get plaintiff in trouble. In fact, Doukas was clearly sympathetic with plaintiff's case, strongly disagreed with the decision to fire him, and met twice with his attorney in preparation for trial. Yet, he still confirmed the fact that plaintiff had been disruptive in the project management class.

Not only did these witnesses appear credible, they generally came forward on their own accord. There is no evidence that Edidin, who was the person supposedly trying to trump up evidence, tried to encourage individuals to report false evidence against plaintiff. Instead, she responded to unsolicited complaints in every instance, with the possible exception of the project management class. And in that case, she only inquired into the issue when she heard her staff smirking about it during a meeting.

There is also no evidence that management took a report about a minor incident and then twisted into something more sinister by exaggerating the facts. All of the complaining witnesses (except Maureen Rose who did not testify) confirmed through deposition or trial testimony that the incident they witnessed was accurately described in the termination memos. As Leslie Shaffer put it, "they've got it kind of verbatim down there."

---

by fabricating evidence.

-28-

Management's explanation is further supported by the fact that the accusations made against plaintiff are consistent with his own assessment of his personality and his work performance and also generally fit together into a larger pattern. Plaintiff generally admitted that he had a recurring problem in dealing with his co-workers. He also conceded that he occasionally used words like "shit" and "crap" when talking with co-workers (Tr. 90) and that he was informally criticized in his later years at Sears about being harsh in his dealings with others. (Tr. 95.)

Moreover, in his termination meeting, plaintiff told Edidin that he was surprised that he was being fired because he "thought things had been actually getting better lately" and that he had been going to counseling to become a "more effective person." (Tr. 49.) While plaintiff's efforts at self-improvement are laudable, they nonetheless indicate that things had *not* been going well for some time and they also contradict his broader claim that he had no idea that his behavior had been sub-par. Likewise, Doukas also confirmed that plaintiff sometimes had problems with interpersonal relations and was "not a team player." (Tr. 271.) It is clear that Doukas viewed this problem as something more than a temporary anomaly because he had a "lot" of discussions with plaintiff behind closed doors about "things such as teamwork and personal relations." (Tr. 272-73.)[15]

Another telling point is that, although plaintiff has denied engaging in certain acts, he has admitted to engaging in many other acts that are very similar in nature and that by themselves fall

---

[15]Granted, Doukas ultimately did not think plaintiff should be fired for willful misconduct, but this is not because he believed plaintiff did not have problems in this area. He just believed that these problems were not insurmountable and could be worked out with informal counseling and corrective review.

within the general rationale for his firing. Specifically, he has admitted that he did the following: (i) he angrily criticized the new computer system in front of Pieranunzi; (ii) he told Shaffer that the new computer system was "shitty;" (iii) he told Shaffer that the new computer training was bad even though he had not personally taken the training; (iv) he criticized management in negative tone in front of 20 to 35 co-workers at the project management class; and (v) he called Shaffer an "airhead" in front of two co-workers.

This conduct clearly could be seen as "an increasingly negative attitude towards management," which is one of the general charges made against plaintiff. (PX 18.) In fact, there is a strong pattern here. Plaintiff repeatedly denigrated management in front of co-workers and strongly criticized the new computer system. As many witnesses pointed out, plaintiff's criticisms were different in kind from those of other employees. Shaffer stated, for example, that plaintiff engaged in a "one-way conversation" and that he failed to offer any constructive criticisms. She also stated that, even though there were a lot of others who did not like the new system, no one else voiced criticisms with the same intensity and negativity as plaintiff. (Dep. 43: "We [] were not accustomed to being sworn at."). Under these circumstances, management reasonably could have viewed plaintiff's general attitude as undermining the morale and the willingness of co-workers to adapt to the new computer system.

Plaintiff makes a series of other arguments. Many of them are along the line that the punishment was too severe for the crime. He says that he should have been given a chance to change his behavior and that the company's personnel manual mandated a process called "corrective review." These arguments echo the view of Doukas who thought that plaintiff did have some problems but that they were not enough to warrant an immediate termination for

-30-

willful misconduct. (Tr. 273: "it wasn't the case that you either improve or you get fired.") The larger problem with all these arguments is that they reduce the dispute between plaintiff and management to a difference of managerial opinion and thus fail to show that management's conclusions were phony. Certainly, different managers might have handled the allegations against plaintiff differently. Doukas, for one, would have further counseled plaintiff while Edidin thought that the problem was more severe. But this type of managerial judgment-call is one that a court may not second-guess.

For example, plaintiff argues that the alleged conduct, even if true, did not justify a firing for willful misconduct under the company's personnel manual because the conduct did not fit within the examples of willful misconduct provided therein. The manual lists "some examples" of willful misconduct, which include things such as "physical violence," "theft of merchandise," and "sexual or racial harassment." (DX 5 at 8-4.) However, Audrey Walker testified that plaintiff's cumulative conduct did amount to willful misconduct even though it did not precisely fit one of the specific examples set forth in the manual:

> It has always been our policy that these were guidelines and not cast in concrete. So this is sort of guidelines where you could go. This doesn't mean that if you don't see it on the list, you can't do it.

(Tr. 193.) There was no other evidence to undermine this testimony. For all the above reasons, the Court finds that plaintiff has not shown that the official explanation for his firing was phony or baseless.

## III. Why Would Management Have Wanted To Prevent Plaintiff From Receiving RIF Benefits?

One of the biggest problems with plaintiff's case is that he has not articulated a plausible

explanation for why management would have been motivated to deny him RIF benefits. The

typical motivation in a § 510 case – the desire to save money – does not exist in this case. *See*

*generally Lindemann v. Mobil Oil Corp.*, 141 F.3d 290, 295 (7th Cir. 1998) (noting that "section

510 of ERISA protects employees against dismissal by employers who seek to *limit the cost of*

health benefit plans by preventing the use of such benefits") (emphasis added). Plaintiff has

conceded that the amount of benefits he would have received under the RIF if he had been

selected (approximately $29,000) was inconsequential to a company the size of Sears and would

not have influenced the decisionmakers under the facts of this case. As Audrey Walker

convincingly testified:

> there's no way in the world that Sears [] could get away with terminating an
> employee to avoid paying severance pay. That just wouldn't be because why
> would Sears single out one employee, decide to terminate that person in order not
> to pay severance.

(Tr. 233; *see also* Tr. 229: "nobody was really concerned about where the money was coming

from").

Plaintiff's theory, as the Court understands it from his complaint and briefs, is as follows.

He was a 15-year employee who was performing well in his job. Then, in a videotape

presentation in January 1992, Sears announced that it would be implementing a RIF. "Head

counts" were to be announced in April. The videotape "promised" that those who would be let

go would receive "significant monetary benefits." (Cmplt. ¶¶ 5-6.)

This announcement allegedly triggered two responses – one in plaintiff and one in Edidin. It caused plaintiff to rely on the promise of benefits. As he states in his complaint: "[i]n reasonable reliance upon Sears's representation that significant monetary benefits would be paid to plaintiff if he were released from employment, plaintiff *continued* in his employment with Sears, putting in long hours of dedicated service." (¶ 6; emphasis added.) The underlying premise is that plaintiff was expecting and anticipating that he would be discharged in the RIF.[16]

According to plaintiff, the announcement also allegedly caused Edidin to decide that she wanted to "get [plaintiff] out of her department." (1/27/03 Br. at 5.) She eventually considered a number of options. Ironically, her initial solution (according to plaintiff) was to try to include him as a participant in the RIF. However, because plaintiff was a high performer who would not qualify as a participant, she had to "orchestrate[] the reduction of his overall performance rating." (*Id.*) She did so by telling Doukas in late January to lower plaintiff's 1992 evaluation causing him to "receive a review rating which was likely to place him at the lower end of the comparison" and thus make him more likely to be selected. (11/22/02 brief at 6-7.) During the same time, Edidin asked in a meeting whether plaintiff should be included as a participant, thus confirming that she was trying to include him in the RIF. She also "took steps" at one point during this time period to transfer him to the credit department.

Then, at some later point, presumably closer to the time he was fired, Edidin changed her mind and decided that she did *not* want plaintiff to be included in the RIF. Therefore, she fired him in an effort to "beat the RIF deadline." This pressure to beat the RIF deadline supposedly

---

[16]Thus, unlike the more typical fact pattern in which a person is complaining that he should *not* have been downsized, plaintiff is arguing (in effect) that he *wanted* to be let go as part of the RIF and that the company interfered with *his right to be discharged.*

explains why the firing was hasty and poorly documented. Plaintiff claims that the reason Edidin changed her mind – from initially wanting to include plaintiff in the RIF to suddenly wanting the opposite – is that Doukas allegedly told her that plaintiff could be rehired by the credit department if he were part of the RIF. (1/27/03 Br. at 5.) Plaintiff maintains that Edidin's ultimate goal was to "punish" him and make it so he could "never come back" to Sears. (11/22/02 Br. at 29.) As a result, she seized upon a "more final solution" of firing him, which had the effect of putting a black mark on his record and also prevented him from being rehired by the credit department. (*Id.* at 8.)

This theory relies on slim evidence and is not persuasive even on its own terms. As for the evidence, plaintiff has very little and what he has is equivocal. For example, he alleges that Edidin took steps to position him for the RIF in January 1992 when (i) she asked in a meeting whether he might be a candidate and when (ii) she asked Doukas to lower one component of his 1992 performance grade. The fact that Edidin asked in one meeting whether he might be a candidate for the RIF does not prove that she had a larger goal of making him a RIF participant. Doukas said that she simply asked if he might be a candidate. He never suggested that her tone was forceful or that she was aggressively pushing the idea. Edidin denied that she sought to include him in the RIF.

As for Edidin's request to lower plaintiff's 1992 performance grade, Doukas did not find the request suspicious and said that such requests were not unusual and were often done to coordinate the reviews among employees to reflect, among other things, the fact that different supervisors graded differently. (Tr. 252, 271.) Although given an opportunity to do so by plaintiff's counsel, Doukas never suggested that Edidin was doing anything out of the ordinary or

-34-

improper. (Tr. 252.) Her request was made in a meeting with others present, thus making it less likely that she was doing something wrong. In any event, the decision to lower plaintiff's grade is more consistent with a legitimate concern that plaintiff's behavior warranted a lower grade given the November 1991 run-ins he had with Pieranunzi and Shaffer.

Plaintiff never explains *why* he thinks that Edidin would have been motivated to deny him RIF benefits. He testified that he did not work closely with her. No evidence was introduced that she ever made a statement exhibiting personal animus toward him. She did get upset with him in November 1991 regarding the Pieranunzi incident, but this was based on her belief that plaintiff acted improperly in telling a co-worker "to get the fuck out of his office." Similarly, even though Doukas testified that he disagreed with Edidin's decision, he never suggested that her decision was anything other than a good faith decision made in an effort to help the company.

Moreover, plaintiff's theory contains too many twists and turns to be believable. Under his theory, Edidin was initially trying to *include* him in the RIF. This does not sound like a person who was trying to punish him. Why waste the time positioning him to be in the RIF and then suddenly change her mind and try to accomplish the opposite? Plaintiff suggests that she changed her mind because she later learned from Doukas that he might be able to work for the credit department and that she was trying to block this possibility[17] However, this assertion is not convincing and is contradicted by the evidence. In particular, even plaintiff admits that Edidin

---

[17]The Court could not find any testimony in the record indicating that Doukas told Edidin that plaintiff would be rehired by the credit department.

tried at one point to get him transferred to credit.[18]  Again, why would she spend time trying to

get him transferred to credit department if her ultimate desire was to keep him from working

there?  Plaintiff asks us to believe that Edidin was veering back and forth between two contrary

goals.  A better explanation is that her willingness to consider him as a possible RIF candidate

and to see if he could be transferred to the credit department indicate that she had an open mind

rather than some pre-determined agenda to punish him.

Plaintiff's theory does not fit the evidence in other ways.  He argues that Edidin decided

to get rid of him after the RIF announcement in January 1992.  By making this argument, he is

obviously trying to establish a temporal link between the RIF and the firing.  However, his timing

is off.  In November 1991, Edidin strongly criticized plaintiff for both his actions toward

Pieranunzi and also for calling Leslie Shaffer an "airhead."  Therefore, it is clear that she began

noticing problems with his performance well over a month before the RIF announcement.  She

would have had great foresight to think about setting him up to be in the RIF before it was even

announced.  Her criticism in November instead reflected a genuine concern about his work

performance.

Finally, one reason why plaintiff's theory is not convincing is that he is not primarily

concerned about the loss of severance benefits but is really more upset about the fact that he lost

his job.  This conclusion is supported by several different facts.  First, he testified that, at the time

he was fired, he had no plans to leave Sears in the future and was thinking of moving out to

Hoffman Estates when the company moved into its new headquarters in late 1992.  (Tr. 64: "I

---

[18]If the company had transferred plaintiff, he would not have been eligible for any
severance benefits.  (Tr. 340.)

had definitely planned to stay on with Sears."). This does not sound like a person who was expecting to be let go as part of a RIF, which is the theory asserted in his complaint. (¶¶ 5-6.).[19] Second, at trial, plaintiff requested as his main remedy in this case that he be reinstated to his former job position and only asked for severance benefits as an afterthought. (Tr. 13.) Third, plaintiff has repeatedly complained that Sears should have given him a chance to correct any problems by going through a corrective review process and doing such things as removing the pictures from his computer. Again, this argument rests on the assumption that he believed he would not be in the RIF and that he did not want to be in the RIF. Why even worry about corrective review if you thought you were going to be downsized a few weeks later? Fourth, the testimony of Doukas, relied upon heavily by plaintiff, likewise suggests that this case has little to do with a concern over ERISA benefits. Doukas made it clear that he "disagreed vehemently" with the decision to fire plaintiff yet, at the same time, he did not believe that plaintiff would have been a RIF candidate. (Tr. 255.) In other words, Doukas did not see any connection between the firing and the payment of severance benefits.

---

[19]The Court recognizes that plaintiff believes that there was a possibility that he might have been hired by the credit department if he had been released under the RIF. However, the evidence on this point is limited, and so it is hard to tell whether this was a realistic possibility. In any event, if plaintiff had been selected to participate in the RIF, it would have been because he had been judged to be a low performer in his group. Having been let go on this ground, he could not have been certain that he would be rehired.

## CONCLUSION

For all of the reasons stated above, the Court enters judgment for the defendants and against the plaintiff.

**ENTER:**

JOHN A. NORDBERG
Senior United States District Court Judge

DATED: _May 27, 2004_